IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,                          Case No. 3:05CR778

           Plaintiff

     v.                                        ORDER

Timothy Neumann,

           Defendant

      This is a criminal case in which the defendant, Timothy Neumann, pled guilty on September 22, 2005, to an information charging conspiracy to commit health care fraud in violation of 18:371 and money laundering in violation of 18:1956(h). The charges resulted from his work as an administrator and billing supervisor for entities owned by his brother, Paul Neumann, a chiropractor, and Paul's wife, Annette Neumann.

      The defendant's plea, which was binding under Fed. R. Crim. P. Rule 11(c)(1)(C) [currently Fed. R. Crim. P.  11(c)(1)(B)], was part of a "package deal," whereby he and Paul Neumann had both to plead guilty if Annette Neumann, another brother, Mark Neumann, and a family friend, Ronald Loeffler, were to avoid prosecution. Another co-defendant, James Altiere, whose plea offer was not part of the government's package to the Neumann defendants, declined a plea offer. Altiere was acquitted at trial.

      Shortly after Altiere's acquittal, the defendant, having retained his current attorney, who defended Altiere at his trial, and Paul Neumann filed motions to vacate their pleas. An evidentiary hearing was held, and the parties submitted supplemental briefs.

In an earlier decision, I overruled Paul Neumann's motion. *U.S. v. Neumann*, --- F.Supp.2d ----, 2007 WL 2907325 (N.D.Ohio, October 04, 2007). For the reasons that follow, Timothy's motion shall also be overruled.

### Background

Paul Neumann is a chiropractor by training. During the 1990s he and his family operated several chiropractic clinics in Toledo and Northwest Ohio under the name Affordable Chiropractic. Sometime during the mid-1990s he learned about an alternative business model, the "multi-disciplinary practice" model, pursuant to which a doctor was hired to work at each of the clinics. According to the proponents of this model, the presence of doctors at the clinics enabled chiropractic providers to bill public and private health care insurers for reimbursement as though the patient treatments were medical, rather than chiropractic.

Beginning in 1997, the Neumanns adopted the "multi-disciplinary" practice business model. In addition to hiring a full-time doctor for each of the clinics, they changed the name of their operations from Affordable Chiropractic to MedBack Clinics. A very substantial portion of the services provided at the clinics continued to be chiropractic treatment.

What changed was that a doctor would see each patient and "prescribe" chiropractic treatment. As a general, and perhaps universal rule, neither that doctor nor any other doctor would be present when chiropractors were providing their treatment.[1] The doctors would only rarely, if ever, do anything else to treat the patients.

---

[1]

To the extent that *bona fide* medical care was, in fact, provided and billed to the insurers, such billings are not at issue in this case. In any event, such care was a small fraction of the professional work done at the clinics.

2

The other thing that changed is that the clinics began billing insurers at the rate applicable to services provided by doctors, rather than chiropractors.

The change in business model and billing practices had at least one other advantage: namely, restrictions on the number of chiropractic sessions for which reimbursement no longer restrained the numbers of treatment [or the income flowing from the clinics]. And the Neumanns became very rich.

The gravamen of the government's charges against the defendant and Paul Neumann was that, by billing as though the clinics were providing medical services, they were violating Medicare regulations limiting the services for which such reimbursements could be received.

The pertinent regulation, which the parties refer to as the "incident to" billing regulation, stated during the time period pertinent to this case:

> Medicare Part B pays for services and supplies incident to a physician's professional services, .   .   ., if the services and supplies are of the type that are commonly furnished in a physician's office or clinic, and are commonly furnished either without charge or included in the physician's bills.

42 C.F.R. § 410.26(a) [Eff. 1997-99].

Further information provided to healthcare providers explained that, during the period encompassed by the information to which the defendant pled guilty, services that were "incident to" medical services [and thus could be billed as medical, rather than chiropractic services], were services that, *inter alia*, were "[p]erformed under the physician's direct personal supervision .   .   . by therapists or other auxiliary personnel who are employees of the physician."[2]

---

[2]

This requirement was introduced at Altiere's trial as Gov't Exh. 1-101(d). I take judicial notice that it was in effect and applicable to the defendant during the period covered by the information.

3

Letters sent by the clinics were the backbone of the government's contention and proof that the chiropractic services provided at the clinics were fraudulently billed as "incident to" medical services, rather than chiropractic services.

The first of these letters would be sent to new patients. It stated, "We have at our command the finest equipment as well as a fully diversified health center, *combining medical and chiropractic*." [Emphasis supplied].[3]

When insurers began to question billings, Paul Neumann drafted [or had Altiere draft, or assist in the drafting of][4] a letter which informed those asking such questions that the billings were proper. The letter stated in pertinent part:

> This letter is in response to your correspondence of [date], regarding chiropractic treatment provided to [patient].
>
> Please allow this correspondence to serve as notice that I am not a chiropractor and that we are a medical facility. Thus, *we do not provide chiropractic care*. Since we are not a chiropractic office, I am requesting that you please review and process this request making the appropriate adjustments so that we may accurately process this account.

[Doc. 38, Attachment 7 at 41] [Emphasis supplied]

If this letter, which the parties and record refer to as the "no chiro" letter, did not mollify or deflect the inquiry, other letters would be sent. One such letter stated:

---

[3]

As already noted, despite any suggestion in the letter of parity between medical and chiropractic services, most of those who were providing most of the patient treatment were chiropractors, and most of what was done was chiropractic treatment.

[4]

The jury at Altiere's trial could, and may have found that the government's proof failed to connect Altiere with the authorship and mailing of this letter beyond a reasonable doubt, and acquitted on that basis. Given the defendant's involvement in the clinics' billing practices, such failure of proof as to him, were he to have gone to trial might well, in light of the other evidence, as discussed *infra*, made a verdict of acquittal as to him far less likely.

We are a medical corporation employing multiple doctors, technicians, medical assistance and other healthcare providers.

Our office is a fully diversified medical center providing services to patients as needed and as ordered by the medical director of the clinic. Our full-time medical director, orders treatment as necessary for each patient.

Nonetheless, treatment may vary due to conditions, needs and severity of the diagnosis and the condition of the patient.

It is not uncommon in our clinic for a patient to receive, at any given time, by the order of the medical doctor any type of treatment, injection, medication, modalities, physiotherapy, exercise program, joint mobilization, massotherapy or other services the patient may require. Nonetheless, the billing reflects only the charges that are usual and customary for services rendered.

[*Id*. at 45].

Another letter that might be sent stated:

As we have previously discussed, please note that Great Lakes Medical Clinic, P.C., Inc., is a medical practice which incorporates chiropractors. Each clinic has at least one full-time medical doctor and one full-time chiropractor.

The medical doctor is the clinic director and, as such, has control over the practice. It is the medical doctor who determines the diagnosis and prescribes the treatment plan.

Since the medical doctor makes all patient assessments and prescribes any treatment, all clinic services are billed under the medical doctor.[5]

[*Id*. at 44].

The inconsistencies between these communications, thousands of which, depending on the purpose of the mailings, were sent during the period covered by the information, are palpable. The patient letter states that chiropractic services are provided; the "no chiro" letter states just the opposite; one follow-up letter makes no direct reference to chiropractic services [though such

---

[5]

In addition to MedBack, the Neumanns, among their other affiliated companies, also operated under the name "Great Lakes Medical Clinic, P.C., Inc."

services might be inferred from some of the descriptions]; and the other follow-up letter acknowledges providing chiropractic services, but doing so ancillary to medical treatment.

In one respect, however, the letters are somewhat consistent: each makes reference to the clinics as "medical" clinics, thereby  communicating either directly or implicitly that they were in the business of providing extensive medical services.[6]

In October, 2000, federal agents searched clinic offices and seized substantial quantities of documents and computers, including copies of the letters. The defendant was present at one location and cooperated with the agents by assisting their execution of their search warrant.

The agents informed the defendant generally about the nature of the investigation and the crimes being investigated. He stated that the billing practices were lawful.

The next development occurred after a nearly four year period of apparent quiescence on April 26, 2004, when the prosecutor met with legal counsel for all the targets. Shortly before that meeting the defendant met with his attorneys; Sam and Robert Kaplan. He reconfirmed his view that the billing practices which he oversaw were lawful.

Among the lawyers in attendance, along with the Kaplans, was Mark Rotert of Chicago. Paul Neumann had retained Rotert and Jon Richardson, a Toledo attorney. Unlike the other attorneys

---

[6]

As noted, there was one doctor on the staff of each clinic, and some minor medical services may have been provided from time to time. But the clinics remained for the most part chiropractic clinics.

To suggest otherwise, as the references in the letters to "medical" clinics and doctors do, has the same degree of verisimilitude as saying that the last person to finish the New York City Marathon "runs with the champions." While true in a very, very minor way, the impression thereby created makes things appear more meaningful and significant than their reality. In both instances, the purpose of the statement is to create an impression that, on closer consideration, proves false.

present, Rotert had extensive experience as both an Assistant United States Attorney and defense attorney with health care fraud prosecutions.

The prosecutor gave all counsel a three-ring binder containing pertinent documents and an outline of the government's case against the targets. He informed counsel that if Paul Neumann and the defendant accepted a package plea, Annette Neumann, Mark Neumann and Ronald Loeffler would not be prosecuted. In addition, charges for billing for unnecessary procedures, which the government also believed the evidence would warrant, would not be brought against anyone.

The materials presented by the government included the letters described above, along with other evidence of the targets' culpability. Government counsel also presented an oral overview of his approach, theory and intentions.

Thereafter, the Kaplans informed the defendant about the proposal. They recommended that he accept the package plea.

A further meeting occurred on May 4, 2004, at which the targets and their counsel were present. Rotert did most of the speaking. He highlighted the significance of the "no chiro" letter. In view of that letter and the other evidence gathered by the government, he expressed his view that the government's evidence of fraud was substantial. He said that he believed the offer to be a good one, and less severe than might have been the case in similar circumstances elsewhere.

Rotert's purpose was to outline for everyone his view of the risks involved in the case. Though he urged acceptance of the deal, he did not advise any individual target about what he or she should do.

Both before and after the meeting, the Kaplans renewed their advice to the defendant to accept the offer.

7

The government imposed a thirty-day deadline for acceptance or rejection. Sam Kaplan was able to have that deadline extended by only a week. On the last day, the defendant agreed to accept the offer.

In the meantime, the defendant had a series of conversations about the case and its consequences with Rotert. He had asked Sam Kaplan if he could speak with Rotert, and Sam had encouraged him to do so.

According to the defendant, he was not informed by anyone that, by seeking advice and information from Rotert, he might be placing Rotert in a conflict situation. Among the defendant's other contentions in this case, he claims that Rotert, by speaking with him about the case while representing his brother Paul, put himself in a conflict situation.

Rotert's testimony at an evidentiary hearing on the instant motion differed from the defendant's with regard to what the defendant knew about whom Rotert represented, and who his attorneys [the Kaplans] were. According to Rotert:

> My impression of Tim, my impression of his attitude based on our phone conversations was the he was reconciled to the fact that he was going to plead guilty, but he was extremely uncertain about what were the practical ramifications. What was going to happen to him? What was going to happen to his family? How soon would be be out? Where would he be in prison?
>
> We also talked about my views about health care fraud prosecutions and about the very difficult issue of or the very difficult prospects for anybody who faces one of those things.
>
> *These were not discussions about what should Tim do.* These were more discussions that I would characterize as, How did we get here? Why is Tim in this very painful circumstance? But there were never discussions in which Tim expressed uncertainty about what he should do. These were discussions about *what's going to happen to me* now because of what I've decided to do.

[ Tr 383-384] [Emphasis supplied].

8

\* \* \* \* \*

I never told Tim Neumann what he should do. If he asked me did I think that the result of a trial would be significantly more painful that the result of a plea, I'm pretty sure that I was able to express to him that ten years in jail is worse than three years in jail. . . . I probably commented that this was a good deal under the circumstances, yes. . . . I did not provide legal advice to Mr. Neumann, to Tim Neuman at all.

[Tr 145].

With regard to what he told the defendant about whether he was giving him advice, or

otherwise representing him and Paul both, Rotert stated:

[E]very time Tim Neumann called me, I would say, you know, Tim, you have your own lawyers, and you must turn to them for advice. If I can be of help to you, I am happy to do it, but I am not your lawyer."

\* \* \* \* \*

I urged upon Mr. Neumann, Tim Neumann, the need for him to work with his own attorney. And I'm sure that I expressed to Mr. Kaplan and Mr. Richardson and others that I was getting calls from Tim Neumann and that I was not particularly – I didn't – I didn't think it was a good thing.

[Tr 137, 141].

\* \* \* \* \*

It would have been inappropriate for me to give any legal advice to Tim Neumann under these circumstances, because I had a clear conflict of interest in advising a co-target and potential co-defendant. For this reason, among others, I did not give Tim Neumann legal advice.

[Tr 147].[7]

With regard to what he and his father did for the defendant, Sam Kaplan testified that he

weighed what evidence there was that might have been favorable, such as correspondence from one

---

[7]

When questioned by me about Rotert's testimony that he reminded him every time he spoke with him that he was not his attorney, the defendant initially equivocated. When asked by me whether he disputed Rotert's testimony, he replied,"No, I'm not going to dispute if that's what he says." [Tr 845-846]

9

of the proponents of the "multi-disciplinary practice" model approving billing for doctor's services, with the unfavorable evidence. [Tr 488]. "It's always with a view," he stated, "towards the likelihood of success." [Tr 488-89].

Kapaln also considered whether the defendant might be able effectively and persuasively to contend that he was not culpable because he had relied on the advice of Altiere, the clinics' lawyers, and otherwise had acted in good faith.

Such likelihood, in Kaplan's view, was substantially undercut by the "no chiro" letter, with its flat-out false statement that the clinics "do not provide chiropractic care."  That  and the defendant's involvement, as head of billing, in having that letter repeatedly sent for a three-year period to public and private insurers, Kaplan stated, "cast[] serious doubt and great risk at trial were Tim to proceed claiming good faith reliance on in-house counsel advice."[Tr 531-32].

Had MedBack, instead of the "rank denial" of the "no chiro" letter, acknowledged that "yes, chiropractic services are provided .   .  . under the supervision of a medical doctor and incident to the doctor's treatment .   .  .," Kaplan "would have had a very different view toward how best to proceed and, in all likelihood, .   .  . would have counseled against entering a plea agreement." [Tr 582]. But, given the "no chiro" letter, there was a "risk of failure, a great risk of failure at trial of either the advice of counsel or good faith defense." [Tr. 584].

Kaplan also considered the prospect of being in trial with, as a co-defendant, the lawyer, Altiere, on whose advice the defendant would be claiming to have relied: "there was a great risk if the matter were to proceed to trial that a jury could conclude that Mr. Altiere was part of the scheme" to be reimbursed at the medical, rather than chiropractic rate. [Tr 537]. Kaplan testified that he discussed the right to counsel defense with the defendant, and that it had also been a subject at

the May 4, 2004, joint meeting between the targets and their counsel. [Tr 555]. He also discussed the good faith defense with the defendant. [Tr 553].

In addition, he testified that he had considered the "incident to" billing issue. [Tr 555-56]. He also related that the defendant had sent him an article, which, among other things, reported that a court had held that the "multi-disciplinary" practice model was a sham or fraud. [Tr 560] He understood that the government's view was that "rather than the chiropractic services being provided incident to the physician's services, in fact, the physician's services were incident to the chiropractic treatments." [Tr 492].

He discussed the "incident to" billing issue with the defendant "on a number of occasions" – his "best guess" being "a half dozen" times. [Tr 559].

The defendant, according to Kaplan:

acknowledged freely and throughout our representation of him that, in fact, Medback did provide chiropractic services, that the no chiropractic services letter that was sent innumerable times was untrue, or at best misleading, misleading to the extent that Mr. Neumann wished or offered to us that he believed reimbursement would be appropriate if that treatment by chiropractors was provided under a medical doctor's supervision.

[Tr 570]

Asked if "throughout your representation" the defendant "always acknowledge[d] that Medback's billing practices were misleading and deceptive?" Kaplan responded: "Yes. Yes. He did .   .   . he always acknowledged they were untrue or misleading at best." [Tr 570-71].

Asked if the defendant "throughout your representation .   .   . always acknowledge[d] that the misleading and deceptive billing practices were carried out with the intention of obtaining reimbursement to which MedBack would not otherwise be entitled," Kaplan responded, "Yes, absolutely. That was by design." [Tr 571]. "The defendant," Kaplan continued, "did always

11

acknowledge the misleading and deceptive nature of MedBack's billing practices and that those practices were carried out with an intention of obtaining reimbursement to which Medback would not otherwise be entitled." [Tr 576].

Kaplan also testified that the defendant came to believe that a jury would find MedBack's billing practices unlawful. [Kaplan at TR 532-533, 565-566, 570-571]. That accorded with Kaplan's view that were the case to go to trial:

> not only would a jury inescapably conclude that chiropractic services were provided by MedBack, they would also inescapably conclude that the provision of those services was denied, in fact, by MedBack through its doctors and counsel, by letters that we've discussed and issued and sent under Tim's supervision and direction and that they were done with the expectation that greater reimbursement would be provided, . . . .

[Tr 569].

Kaplan could not recall that the defendant ever expressed any disagreement with the statement in the plea agreement about knowingly and willingly conspiring to commit health care fraud, causing false mailings and billings to be sent to insurers. [Tr 563-64].

Finally, according to Kaplan, the defendant did not indicate that he was pleading guilty simply to save his family, though that was a consideration. [Tr 565].

### Defendant's Contentions

The defendant contends that he received ineffective assistance of counsel both before and during his plea. He claims he is innocent of any crime, had no intent to defraud and relied in good faith on the advice of the clinics' lawyer, Altiere, that the clinics' billing practices were legal.

The defendant makes various claims in his several briefs. Collated, his claims fall into three categories.

12

First: that, as a result of his conversations with Rotert, Rotert implicitly became counsel to him as well as to Paul; this, in turn, created a *per se* conflict for Rotert and justifies granting his motion to vacate his plea without a showing of prejudice.

Second: his attorneys failed to provide constitutionally acceptable representation because they: a) failed to inform him about Rotert's conflict of interest and its possible adverse impact on him; b) counseled him, despite his innocence and lack of fraudulent intent, to plead guilty; c) failed to inform him and adequately consider potential defenses; d) misstated the legal standard for a reliance on the advice of counsel defense; and e) allowed him to enter a plea that was not knowing because neither their analysis of the government's case nor their investigation of possible defenses was adequate.

Third: his plea was not valid because: 1) he is innocent of any crimes because he never had the requisite intent to commit a crime; 2) he plead guilty to a set of facts that does not amount to a crime; no adequate factual basis was presented at the time of the plea; and 3) the package deal to which he plead was excessively coercive.

Among other exhibits submitted with his  motion to vacate, the defendant provided a sworn

affidavit, which stated, *inter alia*:

I do not believe I am guilty because . . . I *always* believed that the billing practices that were followed at the MedBack Clinics were proper, and because I never intended to defraud anyone. [Doc 28, Exh. A, ¶ 8]

Prior to retaining [current] counsel, *I never knew about a reliance on counsel defense, the Medicare incident-to-billing regulation, or any other defenses*. [*Id*., ¶ 10]

I felt coerced [by the package deal] into pleading guilty even though *I know I am not guilty*. [*Id.*, ¶ 11]

[Doc. 28, Exh. A] [Emphasis supplied].

## Discussion

To some extent, determination of whether to grant the defendant's motion to withdraw his plea depends on my assessment of his credibility. This is particularly true with reference to his allegations about "always" believing in the propriety of the billing practices which he oversaw,

13

"never" knowing about a reliance on counsel defense, the Medicare "incident to" billing regulation, or any other defense, and his putative confidence in his innocence and lack of fraudulent intent."

Each of these assertions, as contained in the sworn affidavit submitted with his instant motion, is false. In truth, the defendant did not always believe that the billing practices which he oversaw and implemented were lawful; he, along with the brother, unquestionably intended to defraud insurers and obtain from them reimbursements to which they knew the clinics were not entitled; he was extensively informed about all possible defenses [and why they probably would be futile]; and, to the extent that the package nature of the deal was a factor in his decision to plead guilty, a sense of innocence played no role in the effect on him from the package nature of the deal.

Even the defendant himself, albeit hesitantly and reluctantly, admitted the falsity of two of these assertions during the evidentiary hearing. After some bobbing and weaving in response to preceding questions, the defendant was asked, "You knew about the reliance on counsel defense, correct?" and the defendant answered, "Yes, I guess you could say yes." [Tr 820]. The defendant acknowledged, moreover, that the fact was that his attorneys had "advised [him] that in their opinion it would not be successful.  .  .  ." [Tr 820].

The defendant followed a similar pattern with regard to the contention in his affidavit about never being made aware of the "incident to" billing regulation. [Tr 821-24] After more bobbing and weaving, he was asked, "So, in fact, you did know about the Medicare incident to billing regulation, and where your affidavit says you did not know, that's not a correct statement?" To which he responded, "Yes, I guess." [Tr 824].

14

As these excerpts suggest, the defendant's testimony during the evidentiary hearing was marked by an impulse to slither away from questions to which the answer was plain, and plainly unhelpful to him and his cause.

I find that on the critical disputes in this proceeding – his protestations of innocence and ignorance of the legal consequences of his actions and his allegations of his attorneys' insufficient consultation, information, understanding and advice about crucial aspects of the case and possible defenses, the defendant's testimony is worthy of no belief whatsoever. Instead of the candor required by his oath, the defendant persistently colored his testimony to try to conceal his culpability.

Ignoring the defendant's acknowledgment at the evidentiary hearing of the falsehoods in his affidavit and the clear import of the other unfavorable testimony, and perhaps emboldened by his success in defending Altiere, the defendant's counsel seeks to have me base my decision on whether the defendant would have prevailed had he gone to trial.

Aside from the fact that I agree entirely with the defendant's former attorneys that such result was highly unlikely, the possible outcome at trial is not a determinative issue.

The adequacy of counsel's pre-plea and plea-taking representation and lawfulness of the plea are not viewed through the lens of what might have happened at a trial. They are viewed, and tested against, the circumstances existing before and when a defendant entered the plea. *See, e.g.*, *Pough v. U.S.*, 442 F.3d 959, 967 (6th Cir. 2006).

What might have happened at trial is, of course, an essential part of a lawyer's decision to recommend a plea of guilty; thus, *post hoc* assessment of the adequacy of that advice takes the possible outcome into account. *See Dando v. Yukins*, 461 F.3d 791, 798 (6th Cir. 2006) ("the prediction of the likely outcome at trial is relevant to determine whether or not the potential defense

15

or evidence would have caused counsel to change the recommendation as to the plea.") (citation omitted).

So, what matters here, in evaluating the overall adequacy of counsel's representation and validity of the plea, is whether reasonably competent counsel would have done what the defendant's lawyers did in the course of formulating and giving their advice to him to accept the package plea agreement. *See generally Hill v. Lockhart*, 474 U.S. 52 (1985). If so [as I find to be the case here], it is not necessary to consider whether, but for the defects in counsel's advice and performance, the defendant would have insisted on going to trial. *See id.* at 59.

I now turn to the defendant's specific contentions.

### 1. Conflict of Interest

The defendant bottoms his claim of conflict of interest on the lie that he was never informed that Rotert was and could only act as Paul's lawyer and to look to Rotert for legal counsel might have an adverse affect.

To prevail on his claim of conflict of interest, the defendant must show that he: 1) engaged in confidential conversations with Rotert, and 2) did so with the reasonable belief Rotert was acting as his attorney. *Navilar v. Mercy Health System-Western Ohio*, 143 F. Supp.2d 909, 913 (S.D. Ohio 2001). As stated in *Hamrick v. Union Township, Ohio*, 79 F. Supp.2d 871, 875 (S.D. Ohio 1999) (internal citation omitted), "[t]he test is essentially 'whether the putative client reasonably believed that the relationship existed and that the attorney would therefore advance the interests of the putative client."

16

I find, as Rotert testified, that *every time* he spoke with the defendant he told him that he was not his attorney, and he had to rely on his own attorneys for advice and counsel. Thus, the defendant cannot satisfy the requirement that he had a reasonable belief that Rotert was acting has his lawyer.

This aspect of defendant's attack on both Rotert and his own attorneys is appalling. Each acted out of an understandable and commendable human instinct – to try to be of comfort to someone in distress. That's why Sam Kaplan told the defendant he could go ahead and call Rotert. And that's why Rotert, despite his own discomfort at doing so, took and returned his calls.

There was no conflict of interest. The defendant knew, and was reminded constantly, who his attorneys were. They did nothing wrong in acquiescing to the defendant's request to speak with Rotert. Rotert did nothing wrong in letting him do so. Indeed, the defendant was well served – and better served than, by hindsight, he deserved – by their kindness and consideration.

### 2. Ineffective Assistance of Counsel

### A. Failure to Inform the Defendant
### About the Alleged Conflict of Interest

As discussed in the preceding section, there was no conflict of interest.

Thus, the defendant's attorneys did nothing wrong, constitutionally or otherwise, when they did not caution the defendant about a possible conflict.

### B. Counseling the Defendant to Plead Guilty

The likelihood of conviction was substantial, and perhaps indubitable. The defendant played a role in sending out bills for reimbursement at medical rates. He knew that the main business was chiropractic. He knew that the "no chiro" letter was false. He knew that the purpose for sending that and other deceitful communications was to get more money than otherwise would have been gotten, had honest reimbursement requests been submitted.

17

Most importantly, the likelihood was great that the government could prove all those things. And the defendant knew, both on his own, and in light of his counsels' advice, that that was so.

Without question, the defendant got the best advice possible under all the circumstances. The government's straight flush may not have royal, but it beat the odd pair or two that the defendant might have been able to place on the table. To fold 'em and walk away – even to prison for a while – was good, sound, and entirely competent and constitutionally adequate advice. Indeed, the only constitutionally defective approach to the case on the lawyers' part would have been to have proceeded to trial on the hope that, somehow, the government would misplay its cards.

### C. Not Considering/Misstating the Defenses

I find that the defendant's attorneys neither misunderstood nor misstated the possible defenses [*i.e.*, lack of intent, advice of counsel and good faith]. They knew what it would take to give some viability to those defenses, and they understood that a vital element – namely the *bona fides* of the defendant's putative good faith – were not available.

The "no chiro" letter was a lie, as the defendant himself admitted to his lawyers.

Even if the evidence didn't so clearly show that it was a lie, it was not consistent with what insurers and others were being told in other letters. That and the other evidence available to the government would, in all likelihood, have persuaded the jury beyond any doubt that the defendant was an important member of and played an active role in a conspiracy to defraud the government of millions of dollars, and that he acted knowingly, deliberately, and intentionally.

The defendant's last bastion would thus have been his contention that he was not culpable because he was simply relying on Altiere's opinion that, despite the clear terms of the "incident to"

billing regulation and essentially and substantially chiropractic nature of the clinics' operations, billing at medical rates was lawful.

The elements of a reliance on counsel defense are: 1) full disclosure of all pertinent facts to counsel, and 2) good faith reliance on counsel's advice. *See, e.g., U.S. v. Lindo*, 18 F.3d 353, 356 (6th Cir. 1994).

Full disclosure is not an issue, as Altiere was, in all likelihood, as well informed as the defendant about what was going on.

The issue is, rather, good faith reliance.

In claiming that he had a viable advice of counsel defense [of which his lawyers failed to inform him], the defendant disregards something fundamental: namely, his awareness that the "no chiro" letter was a lie. His contention is, therefore, that he believed in good faith that Altiere, when telling the defendant [if he did] that seeking reimbursement at medical rates via the "no chiro" letter was lawful, was stating, in effect, that it was lawful to lie to insurers to get more money than otherwise could be gotten.

Thus, to prevail on the reliance on counsel defense, the defendant would have had to contend that: 1) his lawyer told him it was o.k. to lie to insurance companies; and 2) he believed in good faith that it was o.k. to lie to those companies because 3) his lawyer said so.

19

I am confident that most, if not all jurors, would find little indicia of good faith in that contention.[8] The perception of his attorneys that that contention wouldn't get very far in the presence of a jury of twelve men and women honest and true was sound and sensible.

The defendant's attorneys understood the possible defenses. They didn't misstate them; instead, they reasonably, and, in all likelihood, entirely accurately advised the defendant that those defenses had almost no chance of prevailing.

### D. Improperly Counseling, Without an Adequate Basis For Doing So, a Plea of Guilty

The defendant's final challenge to the constitutional competence of his attorneys' performance and advice is that they failed to investigate the facts or analyze them, the law and the options available to the defendant before and while advising him to plead guilty.

There is no merit to this claim.

The defendant claims that his attorneys did not conduct an adequate investigation, and, instead, relied on the government's presentation and materials in formulating their advice to plead guilty. In making this argument, he fails to acknowledge that he has the "burden of demonstrating counsel was ineffective as it relates to this issue, he must state with specificity what the investigation would have revealed, what evidence would have resulted from that investigation, and how such would have altered the outcome of the case." *Nichols v. Bell* 440 F.Supp.2d 730, 763 (E.D.Tenn. 2006).

---

[8]

To the extent that the defendant contends that he also would have had a viable "good faith" defense, his contention is equally unfounded. To be sure, because specific intent to deceive or defraud is an essential element of any fraud offense, a defendant's good faith defeats a finding of such intent, and thus is a complete defense. *See U.S. v. Wall*, 130 F.3d 739, 746 (6th Cir.1997). The defendant being quite unlikely to prevail on an advice of counsel defense due to his lack of good faith, he would have been every bit as unlikely to have prevailed on a good faith defense.

The defendant has not met this burden. He has presented nothing persuasive by way of affidavit, argument or otherwise that would support his implicit contention that, had his lawyers investigated more they would have found something useful. To the extent that his lawyers' briefs point to possible avenues of inquiry and allegedly potential witnesses, those avenues, even if pursued, and those witnesses, even if called to testify, would not have provided a sure and certain, or even a reasonably sure and certain counterweight to the government's proof.

As the discussion in preceding sections of this opinion suggests, the record amply shows that the defendant's attorneys understood the law and analyzed its application to the charges and evidence against the defendant competently. His efforts to poke holes in their assessment – namely, that the likelihood of conviction was great – fail to meet his burden of showing that that assessment, and what they did to formulate it, fell below constitutional norms.

The investigation into the facts, assessment of the law and analysis of the law as it applied to the facts the government was likely to prove at trial were constitutionally adequate. For counsel to have done otherwise than to have counseled a plea of guilty would, under all the circumstances, have been substantially less competent, and served the defendant far less well.

### 3. Challenges to Guilty Plea Proceedings

In challenging the plea itself, the defendant asserts that his plea was not valid because: 1) he is innocent of any crimes because he never had the requisite intent to commit a crime; 2) he plead guilty to a set of facts that does not amount to a crime; no adequate factual basis was presented at the time of the plea; and 3) the package deal to which he plead was excessively coercive.

There is no merit to any of these contentions.

### A. Innocence/Lack of Intent

21

As previously stated, the defendant's claim of innocence and lack of intent is not credible. He is lying when he claims to believe that he is innocent.

There can, in any event, be no doubt whatsoever that he acted with the requisite degree of criminal intent when he knowingly participated in mailing letters that he knew to be false for the purpose of getting reimbursements to which he knew the clinics were not entitled.

Therefore, the defendant neither lacked intent nor is innocent.

### B. Factual Basis

The defendant claims he plead to a set of facts that did not constitute a crime; put alternatively, he claims that the record fails to show that there was an adequate factual basis for his plea. He's wrong.

A principal basis for the defendant's contention is that the manner in which the factual basis came before the Magistrate Judge was inappropriate.

After instructing the defendant to listen carefully to the government's recitation, the Magistrate Judge called on government counsel to recite the factual basis for the plea.

The AUSA began by stating the elements of the charges to which the defendant was pleading guilty, described in detail the sources and types of testimony and documentary evidence the government expected to present at trial, were such to be held, and showed how this evidence would prove the defendant guilty of the offenses of conspiring to commit healthcare fraud and money laundering.[Tr 46 - 54].

After the AUSA's recitation, the Magistrate Judge addressed the defendant:

The Court:      You heard the statement of [AUSA] Uram. I asked you to listen
                carefully to his statement. Did you do so?

Defendant:      Yes.

22

The Court:      And do you want to tell the Court the portions of his statement, if any, that you disagree with?

Defendant:      No.

The Court:      No, meaning you don't want to tell me or, no, you don't disagree?

Defendant:      I don't – I agree, or –

The Court:      All right. So you agree with each of the statements made by Mr. Uram?

Defendant:      Yes.

[Tr 55].

Among the factual statements the defendant, with regard to Count 1 [conspiracy to commit healthcare fraud], thereby admitted were correct and could be proven with competent evidence beyond a reasonable doubt were:

  - he voluntarily entered into the conspiracies;

  - he and members of his family operated the Affordable and Medback chiropractic clinics;

  - a consultant was hired to expand the business and increase its revenues;

  - that plan circumvented the limitations of chiropractic payments by insurance plans; he and his conspirators adopted the proposed corporate structure and practices, converting the Affordable chiropractic clinics to MedBack clinics from June 1997 through mid-1998;

  - he worked as the de facto office manager of the MedBack clinics, with day-to-day responsibility for personnel matters, the computer system, and the billing department;

  - despite seeing a medical doctor for a supposedly new treatment plan, most former Affordable Chiropractic patients were given the same treatment plans and received the same treatments;

  - for the first eighteen months, 90% to 95% of all services provided to new patients were the same chiropractic services as had been given to patients of Affordable Chiropractic;

23

- although MedBack clinics performed tens of thousands of chiropractic spinal manipulations on patients, it never used the correct spinal manipulation billing codes: he knew of and approved using incorrect billing codes to conceal fraudulent billing of chiropractic treatment as medical services; and

- he knew and approved of steps, including purposefully not informing insurers that MedBack employed chiropractors performing chiropractic spinal manipulations and sending letters to insurers falsely stating the MedBack clinics were medical facilities that did not provide chiropractic services, by other members of the MedBack billing staff to conceal its fraudulent billings.

[Tr 52, 54- 55].

Among the factual statements the defendant, with regard to Count 2 [money laundering], admitted were correct and could be proven with competent evidence beyond a reasonable doubt were that he knew of and approved payment of salaries to approximately thirty MedBack medical doctors to support use of false medical doctor office visit codes to conceal MedBack patients were receiving noncovered chiropractic spinal manipulations [Tr 53-54].

The Magistrate Judge then asked::

The Court: And you agree, then, that there were two conspiracies here, that two or more persons were part of this conspiracy so that it existed, and that you had knowledge of the conspiracy, you voluntarily participated and were a member and joined those two conspiracies by doing the acts which Mr. Uram has outlined and that there were overt acts committed by one or more persons in the conspiracy to promote those conspiracies. Do you agree that occurred?

Defendant:     Yes.

[Tr 55].

This procedure complies with Fed. R. Crim. P. 11(b)(3) and established a factual basis for the Magistrate Judge and the undersigned to determine that the defendant was, in fact, guilty of the crimes to which he plead guilty. The Sixth Circuit "has never required district judges to elicit detailed narrative responses from defendant to satisfy [Rule 11(b)(3)'s] factual basis requirement."

*U.S. v. Baez*, 87 F.3d 805, 809 (6th Cir. 1996) (finding factual basis sufficiently presented where defendant gave one word affirmative response after the court had the portion of his plea agreement describing his conduct translated for him and asked if he agreed "with the statements as to [his] involvement in this offense that appear in that paragraph?"); *see also U.S. v. Guichard*, 779 F.2d 1139, 1146 (5th Cir. 1986) (factual basis satisfied when facts supporting charge were read into the record, defendant was asked if he would like to make any changes, and defendant answered in the negative).

Thus, the defendant's arguments to the contrary notwithstanding, the government properly presented, and the Magistrate Judge properly accepted, the factual basis on which the defendant's plea of guilty ultimately was found guilty.

### C. The Defendant's Plea Was Not Coerced

The defendant's final claim is that his plea was not voluntary, but was coerced by the package nature of the government's offer.

The government does not dispute the doctrine that plea offers involving benefits to third parties require greater scrutiny because they involve greater government leverage over a defendant than in purely bilateral plea bargaining. "[A] prosecutor's offer during plea bargaining of adverse or lenient treatment of some person other than the accused . . . might pose a greater danger of inducing a false guilty plea by skewing the assessment of the risks a defendant must consider." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 n.8 (1978).

But the mere fact that a defendant's plea was made in consideration, in part, that someone else would receive a benefit does not make it, without more, coercive. Absent bad faith or other illegitimate government action, which the defendant has not alleged, an offer not to prosecute a

defendant's family member in return for the defendant's guilty plea is not improperly coercive. *Kent v. U.S.*, 272 F.2d 795, 798 (1st Cir. 1959) ("a defendant] must show that he was subjected to threats or promises of illegitimate action. Statements that other guilty parties will be prosecuted if [the defendant] does not plead are not of that description.") (agreement not to charge defendant's fiancé). *Accord Mosier v. Murphy*, 790 F.2d 62, 66 (10th Cir. 1986)(agreement not to prosecute defendant's wife and mother-in-law); *U.S. v. Nuckols*, 606 F.2d 566 (5th Cir. 1979) ("no intrinsic constitutional infirmity in broadening plea negotiations so as to permit third party beneficiaries" including defendant's wife).

There are no indicia of government bad faith or overreaching in this case. Evidence of the defendant's guilt was substantial, if not overwhelming – as was the likelihood of conviction. Aside from what his family members [including his brother Paul] and friend received in leniency, he himself benefitted: his sentence and other sanctions will be far less than if he had gone to trial and been found guilty.

The government's demand for a package plea imposed no improper pressure, and did not cause the defendant's resulting plea to be involuntary.

### 4. Other Issues

A defendant does not have an absolute right to withdraw a guilty plea. *See, e.g., U.S. v. Spencer*, 836 F.2d 236, 238 (6th Cir. 1987). Instead, Fed. R. Crim. P. 11(d)(2)(B) allows withdrawal of a guilty plea after the court accepts the plea, but before it imposes sentence, only if "the defendant can show a fair and just reason for requesting the withdrawal. The defendant has the burden of proving the existence of a fair and just reason for withdrawal of his plea. See, e.g., *U.S. v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996).

26

Generally, a court is to consider several factors when deciding whether to permit withdrawal of a plea of guilty:

  1. The amount of time between the plea and motion to withdraw it;

  2. The presence (or absence) or a valid reason for the failure to move for a withdrawal earlier in the proceedings;

  3. Whether the defendant has asserted or maintained his innocence;

  4. The circumstances underlying the entry of the guilty plea;

  5. The defendant's nature and background;

  6. The degree to which the defendant has had prior experience with the criminal justice system; and,

  7. The potential prejudice to the government if the motion to withdraw is granted.

*U.S. v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994).

The "factors listed are a general, non-exclusive list and no one factor is controlling." *U.S. v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996).

Although I have already determined that there is no merit to the contentions underlying the defendant' motion to withdraw, I shall, in the interest of completeness, examine the defendant's motion to withdraw in light of the conventional factors, as stated in *Bashara*.

Doing so leads to the same result: denial of the defendant's motion to withdraw his plea.

### A. Delay Between Plea and Motion to Withdraw

The defendant entered his guilty plea before the Magistrate Judge on September 22, 2005. She issued her Report and Recommendation, recommending that the plea be accepted, on September 23, 2005.

27

Though I shortly thereafter reviewed the Report and Recommendation and record, my order accepting the plea was not entered until April 6, 2006, shortly after Altiere's acquittal.

Defendant filed the instant motion to withdraw on May 10, 2006, about seven months after he pled guilty.

The defendant has not cited a case in our Circuit in which a motion to withdraw a plea was allowed after so long a period between its entry and the motion. Considerably shorter delays have been held to justify overruling motions to withdraw. *See U.S. v. Pluta*, 144 F.3d 968, 973 (6th Cir. 1998) (four months); *U.S. v. Valdez*, 362 F.3d 903, 912 (6th Cir. 2004) (75 days); *U.S. v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996) (76 day delay); *U.S. v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988) (55 day delay); *U.S. v. Spencer*, 836 F.2d 236, 239 (6th Cir. 1987) (35 days).

The defendant's delay in filing his motion weighs heavily against granting the motion.

### B. Reason for the Delay

I have no doubt whatsoever that the defendant's decision to seek to withdraw his plea resulted solely and exclusively from the fact that Altiere was acquitted. But for that fact, his motion would not be before me.

The only reasons suggested by the defendant for his delay is his inexperience with the legal system and ignorance of his possible defenses, due to his attorneys' ineffective assistance.

As discussed above, his attorneys performed competently and provided the best advice possible under the circumstances. They apprised the defendant of possible defenses and explained why they were not likely to be accepted by the jury.

28

If the defendant truly felt coerced and ill-advised, he would have consulted other counsel sometime before learning of Altiere's acquittal.[9] I find that it was that event, and nothing else whatsoever, that provoked the instant motion.

That is not an acceptable reason for undoing a plea of guilty. This factor also weighs heavily against him.

### C. Assertions of Innocence

The defendant argues vigorously that he has always maintained his innocence. The record shows that this is not so: he acknowledged doing those things, and doing them willfully and deliberately, which suffice to sustain his guilt.

This is so, even though the defendant contends that he never intended to defraud anyone. Even if he believed that, and I don't believe that he does, given his general lack of credibility in my eyes, that doesn't matter. What matters is the legal significance of the actions that he took intentionally. Sending false letters on countless occasions to get money, and getting money that otherwise couldn't be gotten because the recipients relied on the false letters, constitutes fraud. It's the defendant's intent then, rather than his late-generated, self-serving, unconvincing protestations about his lack of intent and innocence, that matter.

---

[9]

The falsity of the defendant's asserted reasons is further evident in the fact that he abided by his decision, as communicated to the government in late May or early June, 2004, to accept the plea. There is absolutely no indication that he had second thoughts or concerns about the desirability or wisdom of pleading guilty between then and entry of his plea nearly sixteen months later. It is simply inconceivable that someone who honestly felt ill-used by the government or his own counsel would not, at the very least, have contacted his attorneys and said, "Maybe we should think about this a bit more," or something to that effect.

29

There is, as well, the fact that the defendant admitted his guilt when he entered his plea. Though the defendant attributes his doing so to the failings of his lawyers, rather than an awareness of his wrongdoing, that admission stands in stark contrast to his present claim of innocence.

Though the defendant may have more often and on more occasions asserted his innocence than those on which he has admitted his culpability, the fact remains that those few occasions count for more, and are more truthful. When he has not admitted the truth, it is because he is someone who, as his demeanor on the stand, both during the Altiere trial and the evidentiary hearing in the case, plainly showed, finds it far easier to rationalize and equivocate, and to avoid the truth, than to admit it. Though that is not an uncommon trait, its exercise, no matter how often undertaken, does not justify allowing withdrawal of a guilty plea.

### D. Circumstances of the Guilty Plea

Both during and before entry of the plea, care was taken to ensure that the process functioned as it should. The defense was fully apprised of the government's principal evidence and its theory of the case. The AUSA showed his cards and made clear how he was going to play them. This gave the defendant far more information about what may have lain ahead than most defendants have when they have to decide what's in their best interest.

As discussed above, the defendant's attorneys considered the options, and were given full heed to the likely outcomes presented by those options. They gave advice that was sensible at the time and appears most sound in hindsight.

The plea agreement was detailed and explicit. I have no doubt that the defendant read it carefully, had ample opportunity to ask questions about it and had it explained fully by his lawyers.

30

Finally, the Magistrate Judge's taking of the defendant's plea was careful and thorough. She dotted every "I" and crossed every "T", and had the defendant do likewise.

There were no flaws of any kind in the entire plea process – from the first statement by the government of its position and offer to the defendant and Paul Neumann through entry of the plea. This factor weighs heavily against the defendant's request to start over.

### E. Defendant's Nature and Background

The defendant is intelligent and reasonably well educated. He is, to speak colloquially, no one's dummy. That means, quite simply, that, when it came time to enter his plea, he knew what he and it were about.

He is also an inveterate equivocator, whose instinctive reaction, when confronted by an unpleasant or unwelcome fact, is to side-step, to try to slide away from meeting it head on. This aspect of his character has not been useful to him in this proceeding, as it gives, and has given, good cause to doubt much of what he says of a self-serving sort.

To the extent pertinent to the pending motion, this factor weighs against the defendant.

### F. Prior Experience With the Criminal Justice System

The defendant has no prior experience with the criminal justice system. This factor is of neutral consequence.

### G. Prejudice to the Government

In light of the foregoing discussion, both of the defendant's substantive contentions and the other issues to be addressed when deciding a motion to vacate a plea, I conclude that the defendant has not shown a fair or just, or any good reason to vacate his plea. Thus, the issue of prejudice need not be considered. *U.S. v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991).

31

Even if the issue of prejudice comes into play, it does not trump the other, more tangible reasons for denying the defendant's motion. This is so, even if I accept, as I am willing to do *arguendo*, the defendant's contention that the prejudice to the government is, in relative and actual terms, slight.

### Conclusion

None of the defendant's substantive challenges has merit. The performance of his counsel, and the quality of representation and advice they gave him more than met constitutional norms. Whatever information he obtained from Mr. Rotert was not tainted by conflicting interests, as Rotert never served as his lawyer, and the defendant was well aware of that fact. There were no defects in the plea-taking process.

Finally, consideration of the pertinent factors under *Bashara* provides no support, much less sufficient support for a decision to grant the defendant's motion.

It is, therefore,

ORDERED THAT the defendant's motion to withdraw his plea of guilty [Doc. 28] be, and the same hereby is denied. The defendant shall be referred to the United States Probation Department for the preparation of a presentence report.

So ordered.


s/James G. Carr
James G. Carr
Chief Judge

32